UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAIME CEBALLOS,<br><br>Defendant. | 5:19-CR-50137-JLV<br><br>REPORT AND RECOMMENDATION REGARDING MOTION TO SUPPRESS (DOC. 27) |

Pending is Defendant's Motion to Suppress (Doc. 27). A hearing was held on Wednesday, May 6, 2020. Defendant was personally present and represented by his attorney of record, Gregory G. Strommen. The Government was represented by the Assistant United States Attorney Gina S. Nelson. Four witnesses testified at the hearing and two exhibits were received into evidence. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## **JURISDICTION**

Defendant is charged in an Indictment with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B) and Possession with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The pending Motion was referred to the Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and United States District Judge

Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

In 2019, law enforcement was made aware that two individuals, Jennifer

Mink and Aubrey Hansen, were dealing heroin in the Rapid City area.  (Doc. 47

at p. 6).  Based on this information, law enforcement obtained a tracker for Ms.

Mink's vehicle.  Id.  Around May of 2019, the tracking device indicated the

vehicle traveled to Denver and returned shortly thereafter.  Id. at p. 6-7.  The

vehicle was stopped by law enforcement.  Id. at p. 7.  The occupants of the

vehicle were Jennifer Mink and Lyle Holton, both of which were arrested after

approximately an ounce and a half of heroin was found in the vehicle.  Id.

While he was incarcerated, law enforcement monitored Mr. Holton's

phone calls made from the jail.  Id. at p. 8.  Initially, Mr. Holton made phone

calls to two individuals, his girlfriend, Alonna Engebreston, and Lisa Robinson.

Id.  During those phone calls, Mr. Holton informed both individuals that he

needed to contact an individual in the Denver area who lived on the Northwest

corner of Clay Street and Florida Street.  Id. at p. 9.  Law enforcement later

determined through their investigation that the defendant, Jaime Ceballos,

lived at an address that matched the description of the vicinity provided by Mr.

Holton in the phone calls.  Id.  In a subsequent phone call, Ms. Engebreston

informed Mr. Holton she was having a hard time locating the address for the

individual Mr. Holton wanted to contact.  Id. at p. 9.  Mr. Holton instructed his

girlfriend to use his Facebook account and look for a male individual named

"Jaime Ceballos or something close to that"[1] and provided a description of what his picture should look like.  Id.  Ms. Engebreston recovered a phone number for Mr. Ceballos and passed along the phone number to Mr. Holton, instructing him to call Mr. Ceballos after 4:00 because of his work schedule.  Id. at p. 10. Law enforcement was able to confirm the phone number given to Mr. Holton was associated with Mr. Ceballos.  Id.

Law enforcement monitored a number of phone calls between Mr. Holton and Mr. Ceballos.  The first was a brief call where Mr. Holton instructed Mr. Ceballos that he had a $60,000 bond, to which Mr. Ceballos responded, "that's crazy, my guy just got popped, and he had six ounces and 4,000 pills on him, and he only got a $10,000 bond."  Id.  Law enforcement believed the voice on the other end of that phone conversation was, in fact, Mr. Ceballos.  Id.

In other phone conversations between Mr. Ceballos and Mr. Holton, the two discussed Trent Michelson and Mr. Holton's mother, Dwanna Oldson.  Id. at p. 11-12.  The court notes that both Mr. Michelson and Ms. Oldson have subsequently been federally indicted for charges on conspiracy to distribute a controlled substance.  See United States v. Michelson, 19-cr-50121-JLV (D.S.D. 2019); United States v. Oldson, 19-cr-50136-JLV (D.S.D. 2019).  Law enforcement understood the conversation discussing Mr. Michelson to be referencing the drug distribution in the Denver area.  Id. at p. 12.  In another

---

[1] At the hearing, law enforcement verbally repeated the quote from the audio recording of Mr. Holton, imitating the manner in which Mr. Holton had pronounced Jaime Ceballos's name phonetically.  As the transcript does not reflect this pronunciation, the court notes this to give context to why Mr. Holton may have said "or something close to that" after relaying Mr. Ceballos's name.  The impression this leaves the court with is that Mr. Holton mispronounced Mr. Ceballos's name when talking to his girlfriend, but was clearly referring to the defendant.

phone conversation between Mr. Ceballos and Mr. Holton, they discuss Ms. Oldson being an employee for them and Mr. Ceballos informs Mr. Holton that Ms. Oldson is "the only one out of his seven in his crew that continued working on a roof." Id. at p. 13. Law enforcement understood "working on a roof" to be a reference to distributing narcotics, particularly in light of the fact that Ms. Oldson is not employed as a roofer and is "an elderly, older female who doesn't appear to be in very good physical health." Id. at p. 14. Additionally, law enforcement already had Ms. Oldson on their radar for suspicions of distribution of narcotics. Id. at p. 13. In another phone conversation, Mr. Ceballos informed Mr. Holton that he was currently staying at Ms. Oldson's residence. Id. at p. 20. Law enforcement's surveillance of Ms. Oldson's residence observed a gray BMW registered to Yvette Flores with the same Denver address as Mr. Ceballos.

In August of 2019, law enforcement conducted a traffic stop of Mr. Michelson and Ms. Hansen which resulted in a discovery of approximately two ounces of heroin. Id. at p. 19. Ms. Hansen admitted to law enforcement that she would buy heroin from Ms. Mink and stated that Ms. Mink and Mr. Holton had the same source in Denver whom she knew by the name "2Low." Id. at p. 19-20. Law enforcement had become aware through their investigation that "2Low" was the nickname of Jaime Ceballos. Id. at p. 17.

Based on the totality of the investigation, law enforcement was granted a pen register for Mr. Ceballos's cell phone number in early September of 2019 to track his movement. Id. at p. 20-21. On September 10, 2019, law enforcement

received an alert that Mr. Ceballos was traveling from Denver to South Dakota. Id. at p. 21. Using pings from Mr. Ceballos's phone, law enforcement was able to determine the cell phone was traveling in a white Pontiac Grand Prix bearing Colorado license plates, traveling North on Highway 79. Id. at p. 24. A local check on the vehicle determined the car was associated with Lyle Holton, who had already been federally indicted.[2] Id. Law enforcement positioned themselves on Highway 79 and conducted surveillance of the vehicle. Id. at p. 22. Detective Chad Sayles was able to positively identify Jaime Ceballos in the passenger seat of the vehicle and an unknown female in the driver's seat. Id. at p. 25. The driver was later identified to be Aurora Martinez. Id.

The vehicle turned off of Highway 79 and into a private driveway of a rural farmstead. Id. at p. 74-75. Before the vehicle reached the end of the driveway, law enforcement activated their lights. Id. at p. 75. Sergeant Swets, the first officer who activated his lights, approached the vehicle on the passenger side, where Mr. Ceballos was sitting. Sergeant Swets informed the occupants he had pulled them over for speeding, which was a ruse to protect the investigation. Id. at p. 76. He then asked the driver, Ms. Martinez, why they had pulled into the farmstead. Id. Law enforcement testified that Ms. Martinez initially stated she pulled off there because her friend told her to, but then roughly a minute later changed her story and stated the GPS told her to pull into the farmstead. Id. at p. 77. Sergeant Swets knew the latter story to

---

[2] Law enforcement was unable to run the license plates in the Colorado database, but a subsequent search by the VIN number also confirmed the vehicle was registered to Mr. Holton. Id. at p. 113.

be false because he saw her phone, which was propped up on the dashboard, prompting her to turn back to Highway 79.  Id.

Sergeant Swets testified that Ms. Martinez and Mr. Ceballos were both nervous, that he could smell the odor of heroin coming from the vehicle, and that he saw what appeared to be a pen barrel snort tube sticking up out of a purse in the backseat.  Id.  The court, having the opportunity to personally observe Sergeant Swets's demeanor while testifying, finds him to be credible. Trooper Griffith, the other officer on the scene, approached the driver's side of the vehicle.  Id. at p. 78.  Trooper Griffith obtained a driver's license from Ms. Martinez and took her back to his vehicle to write a warning for the false speeding violation.  Id. at p. 79.  On the way to his patrol vehicle, Trooper Griffith noticed a bulge in Ms. Martinez's clothing.  Id. at p. 110.  When he inquired about the bulge, Ms. Martinez said it was just her shirt.  Id.  When she ran her hand over the clothing, Trooper Griffith heard a crinkling, cellophane noise.  Id. at p. 111.  Trooper Griffith had Ms. Martinez put her hand on the hood of his patrol car and checked one side of her person and then noticed a snort tube sticking out of the pocket of her sweatshirt on the other side.[3]  Id. at p. 111, 119.  The court also finds the testimony of Trooper Griffith to be credible.  Trooper Griffith confiscated the snort tube which had a brownish residue on it.  Id. at p. 111.  After the search of Ms. Martinez's person, Trooper Griffith indicated to Sergeant Swets that he had found a snort

---

[3] Trooper Griffith testified the bulge in Ms. Martinez's sweatshirt was not the snort tube, but was just Ms. Martinez's body.  Id. at p. 119.  Rather, the snort tube was protruding from a pocket in her sweatshirt.  Id.

tube and was taking her into custody.  Id. at p. 80.  Sergeants Swets testified he was concerned for safety and quickly opened the door, grabbed Mr. Ceballos's wrist, asked him to get out of the car, and placed him in handcuffs. Id.  Sergeants Swets then conducted a search of Mr. Ceballos's person and discovered approximately an eighth ounce of heroin in his coin pocket.  Id. Sergeant Swets also testified he could smell the odor of heroin from Mr. Ceballos's person.  Id.

Mr. Ceballos was then placed in the backseat of another officer's vehicle. Id. at p. 81.  Sergeant Swets conducted a brief search of the vehicle on scene, located methamphetamine and paraphernalia in the glove box, and confirmed the pen barrel in the purse on the back seat.  Id.  While on scene, Sergeant Swets checked on Mr. Ceballos and noticed he was "sweaty and appeared maybe stressed" describing Mr. Ceballos's appearance as "abnormal" and that he had "certainly changed in state from when I placed him in handcuffs."  Id. at p. 82.  Sergeant Swets noted Mr. Ceballos's pants had moved and his underwear was sticking out of the front of his pants which concerned him that Mr. Ceballos had hidden something in his underwear that Sergeant Swets did not find during his initial search of Mr. Ceballos's person.  Id. at p. 82-83. Sergeant Swets testified a distributable amount of heroin is small, often comparable to the size of a golf ball and law enforcement often sees distributable amounts of heroin carried on or inside the persons those attempting to conceal the narcotics.  Id. at p. 83.  After the observation that

Mr. Ceballos's pants were disheveled, law enforcement conducted a second search of Mr. Ceballos's person on scene, but recovered nothing.  Id. at p. 104.

The vehicle was then towed to the DOT shop where the vehicle was searched thoroughly, and Mr. Ceballos was searched again.[4]  Id.  Law enforcement reviewed a video from inside of the patrol car which showed Mr. Ceballos in the back seat "reaching into the back of his pants [with] a painful look on his face during that period of time."  Id. at p. 83-84; (Ex. 2).  This concerned law enforcement that Mr. Ceballos had hidden heroin in his rectum, and that if the package ruptured, the substance would be quickly absorbed into his body and he would overdose.  (Doc. 47 at p. 83-84, 104).  A medical unit was requested to check on Mr. Ceballos, and a strip search was conducted, but law enforcement did not find any contraband.  Id. at p. 104. Law enforcement did notice that "Mr. Ceballos was flexing his buttocks together as if he was trying to hold something inside."  Id. at p. 117.  Law enforcement then returned Mr. Ceballos to the patrol car, applied for, and subsequently obtained, a search warrant for a body cavity search of Mr. Ceballos.  Id. at p. 84, 104-05, 117; (Ex. 1).  Law enforcement did not conduct a body cavity search, because after informing Mr. Ceballos they had obtained the search warrant, Mr. Ceballos admitted that he had an illegal substance on his person.  (Doc. 47 at p. 29, 84).  Mr. Ceballos was then escorted to a

---

[4] Sergeant Swets's testimony is ambiguous as to his statement that Mr. Ceballos was "searched again" at the DOT shop and whether that refers to a third search of his person prior to the strip search, or whether it refers to the third search being the strip search.

bathroom, where he removed a plastic bag containing approximately fourteen grams of methamphetamine from his pants.  Id.

From the search of the vehicle law enforcement discovered, hidden underneath a fender flare on the driver's side front tire was a small package covered in grease that contained approximately 65 grams of heroin, 100 fentanyl pills disguised as Oxycontin pills, approximately an ounce of synthetic cannabinoid, less than a gram of MDMA, and approximately 23 grams of methamphetamine.  Id. at p. 27.  Law enforcement also recovered a ledger, owe sheet, digital scale, small plastic jeweler bags, and letters from Mr. Holton in the Pennington County Jail instructing Mr. Ceballos the fastest ways to travel to Rapid, what ways to avoid, and how much he could sell a "point" and a "gram" for in Rapid City.  Id. at p. 28, 116.

## DISCUSSION

Mr. Ceballos, in his pending Motion, alleges his Fourth Amendment rights were violated and seeks to have evidence suppressed resulting from the search of the vehicle and his person.  (Docs. 27, 28, 36).  His briefing categorizes four areas of contention: (1) law enforcement's encounter with the vehicle; (2) the search of Mr. Ceballos's person; (3) the arrest of Mr. Ceballos; and (4) the search of the vehicle.  (Doc. 36).  The Government opposes the Motion in its entirety.  (Doc. 32).

As noted *supra* in footnote three, it is unclear whether two or three searches of Mr. Ceballos's person were conducted prior to the subsequent strip search.  Regardless, the exact number of searches makes no different to this

court's analysis because they were identical in terms of constitutionality, having occurred after Mr. Ceballos's *de facto* arrest.  See *infra* Section III. Furthermore, only the first search of Mr. Ceballos's person resulted in the discovery of heroin, and therefore, is the only search this court needs to analyze.  See also *infra* Section IV (analyzing the constitutionality of the search of Mr. Ceballos's person).

Likewise, the court need not address the more invasive strip search that occurred after the initial two or three searches of Mr. Ceballos's person, because no evidence was recovered to suppress.  The court also notes that Mr. Ceballos's briefing does not specifically challenge the strip search.

The only other evidence obtained from Mr. Ceballos's person was the plastic bag of methamphetamine that Mr. Ceballos admitted to having on his person, and pulled from his pants, after being confronted with a search warrant for a body cavity search.  (Ex. 1).  Mr. Ceballos's Motion and accompanying briefs do not challenge the validity of the search warrant or the manner in which this evidence was obtained.  Accordingly, the court need not address the search warrant granted for the body cavity search or the resulting seizure of evidence from Mr. Ceballos's pants.

The court's analysis will follow the timeline of events as they occurred on September 10, 2019.

## I.    Law Enforcement's Encounter with the Vehicle was a Stop

In its briefing, the Government argues law enforcement's encounter with the vehicle was not a stop because no lights or sirens were used to compel the

driver to pull over.  (Doc. 32 at p. 4).  Mr. Ceballos argues if the encounter was not a traffic stop, then the encounter was "nothing more than harassment violative of Defendant's Fourth Amendment rights[.]"  (Doc. 36 at p. 1).

Although the vehicle began to pull over without being compelled by law enforcement, the court finds the encounter constitutes a stop because law enforcement activated their lights "as [the vehicle] w[as] nearing the end of that driveway." (Doc. 47 at p. 75).  This indicates the lights compelling the vehicle to physically stop were activated *before* the vehicle came to a complete stop. See also id. at p. 93 (indicating the vehicle had not already stopped when law enforcement activated their lights).

Furthermore, although not dispositive, law enforcement, counsel for Mr. Ceballos, and counsel for the Government, repeatedly characterized the encounter at the suppression hearing as a "stop."  See (Doc. 47 at p. 25, 32-33, 42, 44, 46-48, 56-57, 60, 71, 76, 78-79, 84-85, 87, 93, 100, 107, 109. 113). However, even if a reviewing court would not characterize the encounter as a stop, this court's ultimate recommendation to deny the Motion to Suppress would remain unchanged.

## II.    The Stop of the Vehicle was Constitutional

The Fourth Amendment of the U.S. Constitution provides the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to

11

be seized." U.S. CONST. amend. IV. In terms of the Fourth Amendment, the

law is settled that "a traffic stop entails a seizure of the driver [and passengers]

'even though the purpose of the stop is limited and the resulting detention

quite brief.'" Brendlin v. California, 551 U.S. 249, 255 (2007) (citing Delaware

v. Prouse, 440 U.S. 648, 653 (1979)). "For purposes of constitutional analysis,

a traffic stop is characterized as an investigative detention, rather than a

custodial arrest. . . .  As such, a traffic stop is governed by the principles of

Terry v. Ohio[.]" United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)

(citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Terry v. Ohio, 392 U.S.

1 (1968)).

Therefore, to be valid pursuant to the Fourth Amendment, a traffic stop

"must be supported by reasonable suspicion or probable cause." United States

v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal citations omitted).

> A law enforcement officer has reasonable suspicion when the officer
> is aware of particularized, objective facts which, taken together with
> rational inferences from those facts, reasonably warrant suspicion
> that a crime is being committed. The more rigorous standard of
> probable cause exists when the totality of the circumstances
> justifies the belief that a crime has been committed and the person
> being seized committed it.

Id. (internal quotations omitted). "An officer has probable cause to conduct a

traffic stop when he observes even a minor traffic violation. This is true even if

a valid traffic stop is a pretext for other investigation." United States v. Sallis,

507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted).

Here, law enforcement was candid that, despite the lie told to Ms.

Martinez and Mr. Ceballos, there was no traffic violation forming the basis for

the stop.  However, the court finds the stop was constitutional.  While the ongoing drug investigation likely supports a finding of probable cause, the facts clearly rise to the level of reasonable suspicion, which is a proper standard for a traffic stop pursuant to the Fourth Amendment.  Prior to the stop of Mr. Ceballos, law enforcement was already aware that Ms. Mink and Mr. Holton had been stopped and arrested based on approximately half an ounce of heroin found in the vehicle.  While incarcerated, Mr. Holton made phone calls to two individuals saying he needed to contact an individual in the Denver area who lived on the Northwest corner of Clay Street and Florida Street.  Law enforcement was aware before the stop that Mr. Ceballos lived at an address that matched that description.  When Mr. Holton's girlfriend was unable to locate the address of the individual in Denver, Mr. Holton instructed her to use his Facebook account and to look for the name "Jaime Ceballos or something close to that" and provided a description for a male individual consistent with Mr. Ceballos.  (Doc. 47 at p. 9).  Mr. Holton's girlfriend then obtained a phone number associated with Mr. Ceballos and gave that information to Mr. Holton.

Law enforcement monitored a number of phone calls between Mr. Holton and the number associated with Mr. Ceballos.  Law enforcement, in reviewing the audio recordings on the transcript believed the voice on the other end of the phone conversation with Mr. Holton was, in fact, the voice of Mr. Ceballos.  In one conversation between Mr. Holton and Mr. Ceballos, they compared Mr. Holton's bond to the bond of Mr. Ceballos's "guy" who "just got popped" and had "six ounces and 4,000 pills on him[.]"  Id.  Based on their training, law

13

enforcement understood this conversation to be referencing the distribution of narcotics. Similarly, Mr. Holton and Mr. Ceballos discussed how Mr. Holton's mother, Dwanna Oldson, was the only one out of seven in his crew that continued "working on a roof." Id. at p. 13. Law enforcement also understood this conversation to be referencing the distribution of narcotics based in part on the terminology used, the fact that Ms. Oldson is not employed as a roofer, and that law enforcement already had Ms. Oldson on their radar as being involved in a conspiracy to distribute narcotics. Furthermore, Mr. Ceballos told Mr. Holton he had been staying with Ms. Oldson and law enforcement confirmed a gray BMW at Ms. Oldson's residence registered to an individual with the same Denver address as Mr. Ceballos.

A traffic stop of Mr. Michelson and Ms. Hansen resulted in the discovery of approximately two ounces of heroin. Ms. Hansen admitted she purchased heroin directly from Ms. Mink and stated Ms. Mink and Mr. Holton had the same source in Denver whom she knew by the name "2Low." Law enforcement was able to confirm that it was Mr. Ceballos who went by the nickname "2Low" because his Facebook page had his name followed by parenthesis with the name "2Low" behind it. Id. at p. 17. Similarly, Mr. Ceballos's Facebook profile photo depicted him wearing clothes that had "2Low" printed on them. Id.

On September 10, 2019, pings from the pen register on Mr. Ceballos's cellphone confirmed the phone belonging to Mr. Ceballos was in transit from Denver and had crossed the border into South Dakota. Visual surveillance from law enforcement confirmed Mr. Ceballos was the passenger of the white

Pontiac Grand Prix, bearing Colorado license plates, where the pings from the cell phone were emanating.  Based on the totality of this investigation, law enforcement had reasonable suspicion to stop the vehicle based on the ongoing investigation concerning a conspiracy to distribute controlled substances and had reasonable suspicion to believe the vehicle was carrying illegal substances from Denver for distribution in South Dakota.  Accordingly, the stop of the vehicle was constitutional.

### III.    The Arrest of Defendant was Constitutional

After law enforcement stopped the vehicle, Sergeant Swets observed a snort tube sticking out of a purse in the backseat of the vehicle.  Sergeant Swets also testified to the odor of heroin emanating from the vehicle. Furthermore, Trooper Griffith alerted Sergeant Swets to the fact that he had discovered a snort tube on the driver, Ms. Martinez, while escorting her to his patrol vehicle.  It was at this moment that Sergeant Swets quickly opened the door the vehicle, grabbed Mr. Ceballos's wrist, asked him to get out of the car, and placed him in handcuffs.  (Doc. 47 at p. 80).  After placing Mr. Ceballos in handcuffs, Sergeant Swets searched his person and located approximately an eighth ounce of heroin.  Id.  Although Sergeant Swets testified that, in his mind, Mr. Ceballos was under arrest when he located the heroin on his person, the court finds a *de facto* arrest of Mr. Ceballos occurred prior to the search, at the moment when Mr. Ceballos was pulled from the vehicle and placed in handcuffs.

"Having conducted a lawful traffic stop," law enforcement can detain a

person "for a time reasonably necessary to conduct a limited investigation."
United States v. Mendoza, 677 F.3d 822, 828 (8th Cir. 2012). "At a minimum,
a reasonable investigation can include asking for the driver's license, the
vehicle's registration, as well as inquiring about the occupants' destination,
route, and purpose." Id. (internal quotation omitted).

However, "a *de facto* arrest occurs when the officers' conduct is more
intrusive than necessary for an investigative stop." United States v. Hill,
91 F.3d 1064, 1070 (8th Cir. 1996) (internal quotation marks omitted). "[B]oth
investigative stops and arrests are seizures, but an investigative stop must be
supported by reasonable, articulable suspicion that criminal activity is afoot,
whereas an arrest must be supported by probable cause." United States v.
Bloomfield, 40 F.3d 910, 916, (8th Cir. 1994) (internal quotation omitted).
"There is no clear line between investigative stops and *de facto* arrests." United
States v. Sanford, 813 F.3d 708, 712 (8th Cir. 2016). "During a [ ] stop,
officers must use the least intrusive means of detention and investigation, in
terms of scope and duration, that are reasonably necessary to achieve the
purpose of the [ ] stop." Id. at 713 (internal quotation omitted).

The issue here is whether Sergeant Swets's actions leading up to the
initiation of a search of defendant's person were "the least intrusive means"
that were "reasonably necessary to achieve the purpose of the [ ] stop." Id.
(internal quotation omitted). Although duration of time is an "important factor
in distinguishing between an investigative stop and a *de facto* arrest[,]" the
court also considers the degree of fear and humiliation the police conduct

16

engenders, whether a suspect was transported to a location or isolated, whether the suspect was handcuffed, and whether the suspect was confined to a police car. See Bloomfield, 40 F.3d at 917 (noting the factors to distinguish an investigative stop from a *de facto* arrest). Critical to this case is whether "the officer's *conduct* is more intrusive than necessary[.]" Sanford, 813 F.3d at 712-13 (emphasis added).

Sergeant Swets's investigative stop was exceeded early on, becoming a *de facto* arrest. He testified that after Trooper Griffith indicated he had found a snort tube on Ms. Martinez's person and was going to take her into custody he "quickly opened the door and grabbed [Mr. Ceballos's] wrist, asked him to get out of the car, and placed him in handcuffs also." (Doc. 47 at p. 80). Sergeant Swets testified this happened "fairly quickly" and he then conducted a search of Mr. Ceballos's person. Id. "[T]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Winston v. Lee, 470 U.S. 753, 760 (1985) (internal quotation omitted). Law enforcement's decision to search Mr. Ceballos's person implicates his vital interests in "personal privacy and dignity" and was not the least intrusive means available. Id. Subjecting Mr. Ceballos to a search of his person, where Sergeant Swets examined the inside of his pockets was more "intrusive than necessary for an investigative stop." See Hill, 91 F.3d at 1070. Sergeant Swets's actions in handcuffing Mr. Ceballos and commencement of a search of his person was beyond that "necessary to achieve the purpose of the [ ] stop[,]" and constituted a *de facto* arrest. Sanford, 813 F.3d at 713.

17

The question becomes whether the arrest was supported by probable cause.  The court finds it was.  "Probable cause exists at the time of arrest if the totality of the circumstances known to the officers involved is sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense."  United States v. Chartier, 772 F.3d 539, 545 (8th Cir. 2014) (internal quotation omitted).  The court finds there was sufficient evidence providing a probability or substantial chance that Mr. Ceballos was involved in a conspiracy to distribute narcotics across state lines into South Dakota.

This probable cause is established by the ongoing investigation that was conducted before the traffic stop, in which law enforcement independently verified key details concerning Mr. Ceballos, coupled with law enforcement's observations at the time of the stop.  Specifically, after the vehicle was stopped, Ms. Martinez gave conflicting reports as to where they were headed, there was a snort tube visible in the back seat, the odor of heroin was emanating from the vehicle, and Trooper Griffith found a snort tube sticking out of Ms. Martinez's sweatshirt.  The court finds this totality of information, coupled with the information detailed *supra* in Section II, from the ongoing investigation and the stop sufficiently provided Sergeant Swets with probable cause and he was justified in believing Mr. Ceballos "had committed or was committing an offense."  See Chartier, 772 F.3d at 545; *supra* Section II.

### IV.    The Search of Defendant's Person was Constitutional

Having determined law enforcement's actions during the stop of the vehicle constituted a lawful arrest, the court turns to the constitutionality of Sergeant Swets's subsequent warrantless search of Mr. Ceballos's person.  "[A] warrantless search of the person is reasonable only if it falls within a recognized exception." Missouri v. McNeely, 569 U.S. 141, 148 (2013).  One "exception to the warrant requirement is a 'search incident to a lawful arrest.'" Schaffer v. Beringer, 842 F.3d 585, 593 (8th Cir. 2016) (quoting Arizona v. Gant, 556 U.S. 332, 338 (2009)).  Because Mr. Ceballos was arrested based on probable cause, the search of his person, which resulted in the recovery of an eighth ounce of heroin, did not violate the Fourth Amendment because it was incident to his arrest.  See Basham v. United States, 811 F.3d 1026, 1028 (8th Cir. 2016) ("As a general matter, in a search incident to arrest, police officers are allowed to search not only an arrestee's person for weapons, but also for evidence[.]").

However, "[e]ven if law enforcement's stop evolved into a *de facto* arrest after searching [Mr. Ceballos's] person, the fact that there was probable cause for the arrest independent of the search's results means the outcome of the constitutional analysis is unchanged." United States v. Schwarting, No. CR 14-50100-02-JLV, 2017 WL 4621607, at fn 10 (D.S.D. Oct. 16, 2017) (citing United States v. Leo, 792 F.3d 742, 748 n.1 (7th Cir. 2015).

Accordingly, the court finds law enforcement did not violate the Fourth Amendment when they arrested and subsequently searched Mr. Ceballos.

## V.       Defendant Lacks Standing to Challenge Search of the Vehicle

A defendant challenging a search has the burden to establish "that he personally has an expectation of privacy in the place searched, and that his expectation of privacy is reasonable[.]" Minnesota v. Carter, 525 U.S. 83, 88 (1998). The challenger must prove that the expectation of privacy is subjectively reasonable and objectively reasonable, "that is, one that society is willing to accept." United States v. McCaster, 193 F.3d 930, 933 (1999). "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015) (quoting Rakas v. Illinois, 439 U.S. 128, 148 (1978)).

Here, there are no facts to conclude that Mr. Ceballos had ownership or a possessory interest in the vehicle. See United States v. Barragan, 379 F.3d 524, 530 (8th Cir. 2004) (holding a passenger whose "name did not appear on any ownership documents and . . . did not have an ownership interest" in the vehicle lacked standing to challenge the search of the vehicle"). Furthermore, Mr. Ceballos fails to prove any facts demonstrating he had a reasonable expectation of privacy in the vehicle or was anything more than a mere passenger. See Anguiano, 795 F.3d at 876. Because Mr. Ceballos was a mere passenger, he had no legitimate expectation of privacy in the vehicle, and accordingly, has no standing to challenge the search. See Rakas, 439 U.S. at 143.

## **CONCLUSION**

Based on the foregoing analysis, it is respectfully recommended that Defendant's Motion to Suppress (Doc. 27) be denied.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 10th day of June, 2020.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

21